1   **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2   Name _Epps_     _Timothy_     _T.E_
         (Last)        (First)       (Initial)

3   Prisoner Number _T-16535_

4   Institutional Address _Solenas Valley State Prison, Soledad CA, 93960_

5

6   ==========================================

           **UNITED STATES DISTRICT COURT**

7        **NORTHERN DISTRICT OF CALIFORNIA**

8   _Timothy Epps_
   (Enter the full name of plaintiff in this action.)

9           vs.
                         Case No. _____
10   _Mike Evans, Warden_                 (To be provided by the clerk of court)

11                              **PETITION FOR A WRIT**
                               **OF HABEAS CORPUS**
12

13

14   (Enter the full name of respondent(s) or jailer in this action)

15

16   ==========================================
           Read Comments Carefully Before Filling In

17   When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1    <u>Who to Name as Respondent</u>

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3    jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1.  What sentence are you challenging in this petition?

12             (a)   Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14        _Alameda County Superior Court, Oakland_____

15                   Court                          Location

16             (b)   Case number, if known  _C135298_____

17             (c)   Date and terms of sentence _7/27/01 - 86 years to life_

18             (d)   Are you now in custody serving this term?  (Custody means being in jail, on

19                   parole or probation, etc.)          Yes _✓_   No _____

20                   Where?

21                   Name of Institution: _Salinas Valley State Prison_____

22                   Address: _Soledad CA, 93960_____

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   _Pen. Code, 211, 212.5, subd. (B), 289, 245, subd (A)(2)_

27   _9 counts of 211, 3 counts 664, 211, 487, 245 subd (A)1)_

28   _12022.53 subd (B), 12022.7, 667.61 (D)4) and (E)3) (E)6)_
     _12022.5._

3. Did you have any of the following?

    Arraignment:                  Yes ✓    No _____

    Preliminary Hearing:        Yes ✓    No _____

    Motion to Suppress:        Yes ✓    No _____

4. How did you plead?

    Guilty _____    Not Guilty ✓    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury ✓    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes _____    No ✓

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment          Yes ✓    No _____

    (b)    Preliminary hearing    Yes ✓    No _____

    (c)    Time of plea          Yes ✓    No _____

    (d)    Trial                Yes ✓    No _____

    (e)    Sentencing           Yes ✓    No _____

    (f)    Appeal              Yes ✓    No _____

    (g)    Other post-conviction proceeding    Yes _____    No ✓

8. Did you appeal your conviction?         Yes ✓    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal         Yes ✓    No _____

        Year: _2006_    Result: _Affirmed_____

        Supreme Court of California    Yes ✓    No _____

        Year: _2006_    Result: _Denied Review_____

        Any other court         Yes _____    No ✓

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

1    petition?                                          Yes _____    No __✓__

2    (c)    Was there an opinion?                       Yes __✓__    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                       Yes _____    No __✓__

5           If you did, give the name of the court and the result:

6           _____

7           _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes _____    No __✓__

10          [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16          (a)    If you sought relief in any proceeding other than an appeal, answer the following

17                 questions for each proceeding. Attach extra paper if you need more space.

18          I.     Name of Court: _____

19                 Type of Proceeding: _____

20                 Grounds raised (Be brief but specific):

21                 a._____

22                 b._____

23                 c._____

24                 d._____

25                 Result: _____Date of Result:_____

26          II.    Name of Court: _____

27                 Type of Proceeding: _____

28                 Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____Date of Result:_____

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10    b._____

11    c._____

12    d._____

13    Result: _____Date of Result:_____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No_✓_

24    Name and location of court: _____

25    B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27    support each claim. For example, what legal right or privilege were you denied? What happened?

28    Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1  need more space.  Answer the same questions for each claim.

2      [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3  petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One:_____

6      _____

7      Supporting Facts:_____

8      _____

9      _____

10     _____

11     Claim Two:_____

12     _____

13     Supporting Facts:_____

14     _____

15     _____

16     _____

17     Claim Three:_____

18     _____

19     Supporting Facts:_____

20     _____

21     _____

22     _____

23     If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

(1) The Trial Court Erred In Accepting The Prosecutor's Lengthy Subjective Reasons For Excusing Juror No. 22 Four Years After Jury Selection, Following This Court's Finding of A Prima Facie Showing Of Wheeler/Batson" Error.

The prosecutor excused Juror No. 22, an African-American woman who appeared to be a qualified juror. During the course of voir dire, appellant moved for a mistrial based upon Wheeler and Batson error after the prosecutor exercised three of five peremptory challenges against African-American women (Juror Nos. 1, 22, and 40). (ART 730-735.) Appellant was African American and that the challenges meant not a single person of African American descent remained among the twelve prospective jurors in the box. (ART 733.) According to the clerk's certification executed following appellant's motion to augment the record in the previous appeal, no written questionnaires were used during voir dire in this case. As to voir dire and Juror No. 22, the D.A. stated, (I do have same recollection, There were some things I like about here on paper, in the end I simply was not comfortable with her attitude, demeanor and some of her responses) (Id. at pp. 23.) Petitioner dispute the prosecutor's impressions regarding demeanor; his recollection of the jury was exactly the opposite of the prosecutor; he recalled this juror to be a warm and objective person. Similarly, she struck him as a bit of a loner, someone who was not particularly sociable. However, on the record he states, I did not see her mingling with other jurors during the breaks. Though she was communicative and responsive. The prosecutor also sared he felt the juror's responses was cynical. However, the prosecutor reasons for fearing the juror was a loner were implausible, speculative, and contradicted by similar responses from other jurors. (Id. gp. 2-3.) More over, several other jurors who sat on the case lived alone, did not belong to any clubs or groups other than a church, reported the same sorts of solitary-sounding hobbies, and/or worked in supervisory positions, including: Juror Nos. 30, 43, 49, 70, 76, 79, 82, 97, 100, and 119.) (Id. at pp. 3-5.)" This African American woman was the only prospective juror whom the prosecutor asked, (is this anything about defendant's appearance, his age, his demeanor, that causes you to think he's entitled to any special consideration, leniency or anything?) This question suggested racial stereotyping, not an uncomfortble feeling based on aloofness, cynicism, or undue sway with jurors, was at play. The court never stated it reviewed the transcript of voir dire. The court also ruled immediately after defense counsel's presentation without taking time to refer to the transcript. The court ruled the challenge was subjectively race-neutral, but offered no reason for this conclusion beyond its observations of this prosecutor in other cases. However, this ruling was error. The law and standards of review which stated in People V. Wheeler, supra, 22 Cal. 3d at pp. 276-277, the California Supreme Court held that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by jury drawn from a representative cross-section of the community. The United States Supreme Court has denounced the same pernicious practice" (People V. Turner (1986) 42 Cal. 3d 711, 716.)

declaring racially discriminatory jury challenges. Flatly unconstitutional under the equal protection clause of the Fourteenth Amendment. (Batson V. Kentucky, supra, 476 U.S. at p. 89.) Improper exercise of a peremptory challenge against even a single juror constitutes both Federal and State Constitutional error. (People V. Wheeler, supra, 22 Cal. 3d at p. 284, fn. 32; United States V. Wilson (8th Cir. 1989) 884 F. 2d 1121, 1122.)

## (2.) Epps Rights to Jury Trial Has Been Violated Of The Sixth Amendment Due To Being Exposed To Highly Publicity In The Media Of His Community, Which He Was Deprived Due Process.

There was information in the record on petitioner's first appeal indicating the case garnered significant media attention in the Bay Area. This was highly prejudicial and brought bias against petitioner within his trial. To try a defendant in a community that has be exposed to publicity highly adverse to the defendant is per-se grounds for reversal of his conviction, More so, no jurors should not need to show that the jurors were in fact prejudiced against him. As shown here the following cases: See Sheppard V. Maxwell, 384 U.S. 333, 351-352, 86 S.ct. 1507, 1515, 16 L. Ed. 2d 600; cf. Rideau V. State of Louisiana, 373 U.S. 723, 727, 83 S.ct. 1417, 1419, 10 L. Ed. 2d 663. See also Estes V. State of Texas, 381, U.S. 532, 542,-544, 85 S.ct. 1628, 1632-1633, 14 L. Ed. 2d 543; 381 U.S. 562-564, 85 S.ct. 1642-1643; 381 U.S. 593-594, 85 S.ct. 1665-1666.

3. At the hearing the prosecutor comments, statements and questions to Juror NO. 22, an African-American woman was improper and was more so prejudicial within petitioner trail.

The prosecutor excused Juror No. 22, an African-American woman who appeared to be a qualified juror. (ART 1-936; CT 460-466.) During the course of voir dire, appellant moved for a mistrial based upon Wheeler and Batson error after the prosecutor exercised three of five peremptory challenges against African-American women (Juror Nos. 1, 22 and 40).

The prosecutor commented briefly on the issue of a prima facie showing, but the court did not solicit reasons from the prosecutor for the challenges. (ART 734-735.) The court denied the defense motion, finding there's an insufficient showing under Wheeler and Batson. (ART 735.) In the appellant court previous opinion, the court found appellant made a prima facie showing the prosecutor exercised this peremptory challenge in impermissible fashion. (II CT 112-119.) After carefully scrutinizing the entire record, this court can find absolutely no race-neutral reason for having excused Juror No. 22. (C.T. 116.1) Further, neither the prosecutor nor the trial judge made any statements or observations appearing in the record that support any inference other than that Juror No. 22 was excused because of her race. The prosecutor also said he felt one of the juror's responses was cynical. At one point during voir, the court asked whether dealing with others in a group setting, as she had in her job, ever presented problems for her. (ART 612-613.) She replied: No, it didn't. (ART 613.) She added, I know each individual has a perspective and its based on what you want it to be, whatever, each individual. (ART 613.) The prosecutor stated he felt the latter comment struck me as rather cynical, though I did understand her point (RT [October 15, 2004] 4.) This indicated she might be a hard person to work with and that she believed people cannot really be objective, which is what jurors are supposed to do. People V. Wheeler, supra, 22 Cal. 3d at pp 276-277; People V. Turner (1986) 42 Cal. 3d 711, 716), (Batson V. Kentucky, supra, 476 U.S. at p 89.) declaring racially discriminatory jury challenges flatly unconstitutional under the equal protection clause of the Fourteenth Amendment.

1      List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4 _People v. Wheeler, supra, 22 Cal. 3d at pp 276-277_

5 _Batson v. Kentucky, supra, 476 U.S. at p 89_

6 _People v. Turner (1986) 42 Cal. 3d 711, 716_

7 Do you have an attorney for this petition?               Yes_____    No __✓__

8 If you do, give the name and address of your attorney:

9 _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on _May 20th 2008_            _Timothy Copp_

14           Date                          Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

COPY

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

#### FIRST APPELLATE DISTRICT

#### DIVISION THREE



FILED
Court of Appeal First Appellate District

OCT 1 9 2005

Diana Herbert, Clerk

By _____ Deputy Clerk

| | |
|---|---|
| THE PEOPLE, <br> Plaintiff and Respondent, <br> v. <br> TIMOTHY EPPS, <br> Defendant and Appellant. | A108916 <br><br> (Alameda County <br> Super. Ct. No. C135298) |

Defendant Timothy Epps appeals the reinstatement of his conviction following a remand from this court to determine if the prosecution improperly exercised its peremptory challenges. Epps was charged with 17 counts of criminal conduct relating to a violent home invasion robbery in Piedmont, a grand theft in San Leandro and a string of robberies at Oakland businesses. A jury trial took place from September 5 through October 3, 2001, at which Epps was found guilty on all counts. Epps was sentenced to 93 years to life. On appeal this court rejected most of his claims of error but agreed that the trial court incorrectly failed to find that Epps had made a prima facie showing that the prosecutor excluded a prospective juror for a discriminatory reason. The conviction was vacated and the case was remanded to the trial court to give the prosecutor the opportunity to rebut the prima facie showing and to determine in light of the showing whether the peremptory challenge had been exercised improperly. After conducting two hearings on the subject, the trial court found that the peremptory challenge was not

exercised for a prohibited reason and reinstated the judgment.[1] Epps timely appealed. We conclude that the trial court did not abuse its discretion in accepting the prosecutor's explanation for the questioned challenge, and affirm.

## BACKGROUND

### *The original Wheeler/Batson motion and appeal*

Quoting from this court's prior opinion, "During voir dire, Epps made a "*Wheeler/Batson*" motion, claiming that the prosecution had exercised its peremptory challenges in a discriminatory fashion in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). The court denied the motion, finding that Epps had not made a prima facie showing of improper use of peremptory challenges under *Wheeler* and *Batson*.

["Prior to the motion, the prosecution had exercised five peremptory challenges, three of which were used to excuse Juror Nos. 1, 22 and 40 from the panel. Of these three, Nos. 1 and 22 indisputably were African-American.] . . . [D]efense counsel argued that/no explanation appeared for excusing Juror No. 22.]

"Juror No. 22 testified that she had lived at her current residence in Oakland for 14 years; that she had been a nurse supervisor at a hospital for about 11 years and in that position supervises 30 staff members; that she had been a nurse for 27 years but had never worked in an emergency room; that she had never had contact with the police in the course of her employment; that she had a Master's degree in nursing administration; that she is single, lives alone, and has a 20-year-old daughter who is studying political science in hopes of becoming a judge; and that she had never been on a jury before. She also testified that she had been robbed at gunpoint in 1980, but that she had never been to a photographic or physical lineup to identify a perpetrator. However, she told the court that she felt she could be fair and impartial in evaluating this case. She testified that neither

---

[1] The prior decision of this court also noted certain sentencing errors which the trial court was directed to correct if the judgment were reinstated. These corrections have been made and the new judgment sentences defendant to a prison term of 86 years to life.

she nor any of her relatives or close friends had ever been arrested or charged with a crime. She attends church and volunteers there, but is not a member of any other clubs or organizations. She did not remember seeing any media coverage of the Piedmont robbery.

"Defense counsel argued that the prosecutor's fifth peremptory challenge left no African-Americans in the jury box. He argued that Juror No. 22 appeared "to be an ideal candidate to serve," and that being a victim of an armed robbery herself, "If anything, I would think she would be biased against the defense as opposed to the district attorney. The only rationale that I can see for excusing her has to do with . . . the fact she's an African-American woman and my client is an African-American male." After hearing from the prosecutor, the court found "that there's an insufficient showing under a Wheel[er]/Batson and denie[d] the motion at this time without prejudice." (*People v. Epps* (July 25, 2003, A094952) [nonpub. opn.] pp. 21-23, fn. omitted.)

Upon reviewing the record, this court held that no nondiscriminatory reason for dismissing Juror No. 22 could be found, and that the trial court therefore had erred in failing to find that a prima facie case of discrimination had been made and requiring the prosecutor to rebut that showing. We concluded that "the circumstances of this case warrant providing [the prosecutor] an opportunity to rebut the prima facie showing if he is able to do so. Should the prosecution provide a nondiscriminatory explanation for having challenged Juror No. 22, it will be for the trial court to weigh the credibility of the explanation and to make a finding as to whether or not she was excused for an improper reason." (*People v. Epps, supra,* [nonpub. opn.] at p. 28.)

## Hearings and findings on remand

At the first hearing on remand, the prosecutor represented to the court that he had reviewed the transcript of the jury voir dire and his notes from the trial. He stated that, "It is also worth noting that this case was among the most high profile, bizarre and disturbing cases I've ever tried and much of it I will never forget. As to the jury selection and the juror in question, Juror number 22, I do have some recollection. What I recall is, though there were some things about this juror that I liked on paper, in the end I simply

3

was not comfortable with her attitude, demeanor and some of her responses. She struck me as cold, aloof and cynical and I had serious concerns as to how she would get along with the other jurors. A number of factors led to this impression. First, she seemed devoid of any humor, even with the court. At one point the court kidded with her about other jurors switching numbers. Although others laughed or smiled, her responses, though not inappropriate, failed to grasp the court's light-hearted intentions at that time. [Although] I realize serving on a jury is solemn serious responsibility, I'm looking for jurors who can share a laugh with each other, the lawyers or the court when appropriate.

"She also struck me as a bit of a loner, someone who was not particularly sociable. Though conversational on the record, [I did] not see her mingling with other jurors during the breaks. She described herself as a single mother who lived alone; someone who volunteered with the church, but always remained in the background; someone who otherwise did not belong to any clubs or groups; someone who primarily liked to read, shop or do crossword puzzles in her spare time; someone whose best friend lived out of state; someone who never spoke with her best friend's husband, a judge, for unknown reasons; someone in the nursing profession for almost 30 years who has failed to interact with law enforcement, even during those occasions when apparently they were stationed just outside the patient's room door; someone who had virtually no contact with the court system, positive or negative.

"Now, none of these facts by themselves were controlling or dispositive. But collectively, they made me question her ability to work smoothly and comfortably with others and to evaluate the credibility of civilians and police officers alike. Her life experiences seemed isolated to me. Nor did I care much for her response during the court's questioning as to whether working in group setting presented any problems for her. I was looking for responses from jurors that would suggest they worked amiably and effectively in group settings. Instead, in a response, she suggested that everybody's perspective is based essentially on, quote, what they want it to be. Though I understood her point, it struck me as rather cynical and seemed to rule out the idea of objective, unbiased truth. In my mind she seemed to be suggesting folks couldn't be really

4

objective or unbiased. That is, they couldn't see beyond their own limited perspectives. But jurors are instructed to do just that; that is, evaluate the evidence . . . impartially. I strongly disagree with the notion that people can only see what they want to see. This attitude or belief on her part led me to believe that in her capacity as a supervisor or prospective juror, she could be a difficult person to work with. And as both a health care professional and as a supervisor, I feared she also might exercise undue sway and influence during jury deliberation in a case where medical testimony was not only corroborative, but also critical to proving the case. If she was someone I was otherwise comfortable with, I suppose this might have been an asset, rather than a liability. But in this case, I never had a good feeling about the juror.

"My own voir dire of this juror did nothing to change this impression. Though she was communicative and responsive, I simply felt no connection with her. At no time [did] the fact that she was an African-American woman enter into my evaluation. Even though I liked the fact she liked gun control and was a victim of [a] similar offense, in the final analysis, the potential risks, in my mind, associated with keeping her far outweighed any perceived benefits."

The prosecutor likewise clarified his reasons for exercising peremptory challenges against two other minority jurors. One he believed to be Asian-American and explained that he dismissed her because of "her uncle's ties to organized crime and potential sympathy for criminals, namely thieves." The second "made it clear she had a problem with the surreptitious recording of jailhouse conversations which were used in part to prove the charges in this case. That fact alone made her unacceptable."

Defense counsel requested a continuance so that he could "get a transcript of the reasons articulated by the district attorney and for the purpose of comparing and contrasting those reasons as it relates to the other prospective jurors that we had in this case," and to submit points and authorities to the court. The request was granted. At the continued hearing, defense counsel argued that the reasons proffered by the prosecutor were pretextual. He pointed out that several other jury pool members who were eventually empanelled were also "loners" who did not belong to clubs or groups. He

5

noted that other empanelled jurors had supervisory positions at their work, noting a doctor who was a "consultant pharmacist," a business analyst for a department store, one juror "who had 20 years of supervision, first with the telephone company and then with a real estate firm," one juror who "ran a manufacturing company before he retired," a retired mechanical engineer, and a systems analyst for a large bank. Defense counsel argued that he recalled Juror No. 22 as being "warm and objective," and not cold, aloof or cynical. He also pointed out that the prosecutor asked the following question only of Juror No. 22: "Is there anything about his [Epps's] appearance, his age, his demeanor that causes you to think he's entitled to any special consideration, leniency or anything?"

⌊After hearing defense counsel's argument, the trial court found "that the peremptory challenge exercised by the prosecution was proper. The subjective nature of the jury selection process exercised by the prosecution was not based on race, but on race-neutral grounds.⌋Let me also indicate I've tried many cases with [this prosecutor], and never found him to exercise any kind of challenge based upon race."

## DISCUSSION

*Wheeler* held that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community" under the California Constitution. (*Wheeler, supra,* 22 Cal.3d at pp. 276-277.) Such a use of peremptory challenges also violates the federal constitution. (*Batson, supra,* 476 U.S. at pp. 84-89.) *Wheeler* establishes a rebuttable presumption "that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground." (*Wheeler, supra,* at p. 278.) "If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein. He, too, may support his showing by reference to the totality of the circumstances: for

6

example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*Id.* at pp. 281-282.)

The United States Supreme Court's formulation of the procedure under *Batson* is similar: "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767.) " '[T]he trial judge's findings in the context under consideration here largely will turn on evaluation of credibility,' and for that reason 'a reviewing court ordinarily should give those findings great deference.' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 918 (*Reynoso*).)

Epps argues that the prosecutor failed to rebut the prima facie showing that racial bias motivated the use of his peremptory challenge to excuse Juror No. 22. Epps states that "[t]he prosecutor offered facially neutral reasons for purposes of the second prong of the inquiry, but the reasons are wholly insufficient to rebut the continuing inference this challenge was based on group bias." He argues that some of the factors that led to the dismissal of Juror No. 22 applied to jurors who were empanelled.[2] However, such contradictions do not necessarily invalidate the proffered race-neutral reasons. "Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge. In addition, the particular

---

[2] Epps also argues that the prosecutor's assertions that Juror No. 22 was a "loner" and that he feared that her supervisory experience might cause her to have undue influence on the jury are contradictory. The two characteristics are not mutually exclusive, however; a person who is not particularly sociable nonetheless may have a strong personality to which others might defer.

combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1220 (*Johnson*).)

The *Johnson* court continued, "It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar . . . . It is therefore with good reason that we and the United States Supreme Court give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose." (*Johnson, supra*, 47 Cal.3d at p. 1221.) Here, according to the prosecutor, a variety of factors contributed to his unease with Juror No. 22. Factors that may have applied to other jury pool members who were not excused were not considered in isolation. The prosecutor underscored the interrelationship between the various factors in prompting his challenge to Juror No. 22 when he commented, regarding her potential to influence other members of the jury because she was both a healthcare worker and a supervisor, that "[i]f she was someone I was otherwise comfortable with, I suppose this might have been an asset, rather than a liability. But in this case, I never had a good feeling about the juror."

8

Epps also challenges the prosecutor's statements regarding Juror No. 22's demeanor as "vague and unreviewable." But the prosecutor was quite specific about the aspects of the prospective juror's demeanor that caught his attention, pointing to her failure to join in the laughter at a joke made by the trial court, the fact that she did not mingle with other jury pool members during recesses, and her reserve in answering questions. "It is well settled that '[p]eremptory challenges based on counsel's personal observations are not improper.' [Citation.] In *Wheeler* itself we observed, 'Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another" [citation]—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him.' [Citation.] . . . '[N]othing in *Wheeler* disallows reliance on the prospective jurors' body language or manner of answering questions as a basis for rebutting a prima facie case' of exclusion for group bias. [Citation.] . . . 'Nowhere does *Wheeler* or *Batson* say that trivial reasons are invalid. What is required are reasonably specific and neutral explanations that are related to the particular case being tried.' " (*Reynoso, supra*, 31 Cal.4th at p. 917.)

Epps questions the prosecutor's ability to remember his reasons for excusing a juror four years after the trial. As we noted in our prior opinion, however, "the length of time is not a barrier to remand, per se. (See *United States v. Tindle* (1986) 808 F.2d 319 [trial began on October 11, 1983, and remand for further inquiry into reasons for excusing jurors occurred on December 19, 1986].)" (*People v. Epps, supra*, [nonpub. opn.] at p. 28.) The prosecutor's explanation that "this case was among the most high profile, bizarre and disturbing cases I've ever tried and much of it I will never forget" was credible. The trial was long and many witnesses testified to Epps's violent and disturbing behavior. There was information in the record on the first appeal indicating the case garnered significant media attention in the Bay Area. The fact that the prosecutor retained a vivid recollection of this particular trial four years later is not implausible.

*media attention*

9

Epps next argues that the trial court's findings on the motion were inadequate. He quotes *People v. Allen* (2004) 115 Cal.App.4th 542, 548 for the proposition that " 'more is required of the trial court than a global finding that the reasons appear sufficient.' " (Quoting *People v. Silva* (2001) 25 Cal.4th 345, 386.) This is the case, however, only "when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both . . . ." (*People v. Silva, supra*, at p. 386.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*Ibid.*) "*Johnson* reaffirmed that when ruling on a *Wheeler* motion, the trial court 'must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ." ' [Citations.] But in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's race-neutral reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom." (*Reynoso, supra*, 31 Cal.4th at p. 919.) The trial court's ruling in this case was adequate to meet this standard.

Epps objects that the trial court's observation regarding previous trials involving the same prosecutor is insufficient to support the finding that there was no *Wheeler/Batson* error here. The trial judge's observation constituted only a portion of the basis for his ruling, however, and was entirely appropriate. *Wheeler* recognized that ruling on a motion for improper exercise of peremptory challenges " 'requires trial judges to make difficult and often close judgments. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' [Citation.] They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad

10

judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay." (*Wheeler, supra,* 22 Cal.3d at p. 281.)

In conclusion, the record here provides no basis to disturb the trial court's evaluation of the credibility of the prosecutor's explanation for excusing Juror No. 22. The court did not err in finding that the prosecutor rebutted the prima facie showing that Juror No. 22 was challenged because of her race.[3]

## DISPOSITION

The judgment is affirmed.

_____
                                    Pollak, J.

We concur:

_____
Corrigan, Acting P. J.

_____
Parrilli, J.

---

[3] Epps also argues in this second appeal that under *Blakely v. Washington* (2004) 542 U.S. 296, the trial court erred in imposing an upper term sentence without jury findings establishing the factors in aggravation. Since the opening brief was filed, our Supreme Court issued its decision in *People v. Black* (2005) 35 Cal.4th 1238, 1244, holding that "the judicial factfinding that occurs when a judge exercises discretion to impose an upper term sentence or consecutive terms under California law does not implicate a defendant's Sixth Amendment right to a jury trial." Therefore, Epps's challenge to the imposition of an aggravated sentence is not well taken.

Court of Appeal, First Appellate District, Division Three - No. A108916
**S138878**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

TIMOTHY EPPS, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
F I L E D

JAN - 4 2006

Frederick K. Ohlrich Clerk

DEPUTY

_____
Chief Justice

Timothy Epps # T-16535  C4-108
Salinas Valley State Prison
P.O. Box 1050  C4-108
Soledad, Ca. 93960-1050

Confidential!

STATE PRISON "ONLY
GENERATED MAIL



RECEIVED

MAY 2 9 2008

pro se

Office Of The Clerk, U.S. District Court
Northern District Of California,
450 Golden Gate Ave.,
San Francisco, Ca. 94102

Confidential!

